# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3934

_____

Alane King, as Conservator and Natural  *
Parent of Amber Lynn Schanus,         *
                                   *

       Plaintiff - Appellant,    *

                                 *   Appeal from the United States
    v.                            *   District Court for the
                                 *   District of Minnesota.

Hartford Life and Accident Insurance  *
Company,                      *
                                   *

       Defendant - Appellee.   *

_____

Submitted: November 21, 2003

Filed: February 9, 2004
_____

Before MURPHY, LAY, and BRIGHT, Circuit Judges.
_____

BRIGHT, Circuit Judge.

Martin Schanus, an insured party under a Hartford Life and Accident Insurance Company ("Hartford") accidental death insurance policy, died when he crashed his motorcycle while intoxicated. Hartford denied double indemnity benefits on the grounds that the crash did not meet the definition of an accident under the policy. In response, Alane King, as conservator for Amber Lynn Schanus (Martin Schanus's daughter, the policy beneficiary), brought an action against Hartford under ERISA, 29 U.S.C. § 1132(a). The parties both moved for summary judgment, and King now

appeals from the district court's decision in favor of Hartford. We reverse the district court and remand for further proceedings consistent with this opinion.[1]

## I.     Factual and Procedural Background

The parties do not dispute the facts in this case. In the early hours of June 10, 2000, Schanus left a Minnesota bar legally intoxicated with a blood alcohol content of .19%. He got on his motorcycle and drove away, but did not put on a helmet. Schanus crashed while driving too fast around a sharp turn in the winding road. The force of the crash threw him from the motorcycle into a fence. Schanus died from brain injuries caused by the impact.

At the time of his death, a Hartford insurance policy provided by his employer covered Schanus. The policy provided general life insurance benefits equal to 150% of Schanus's salary, which Hartford paid. However, Hartford disputes King's entitlement to receive benefits under a policy provision offering a second 150% when an insured party's death results from an accident. King argued that Schanus's crash fell within the policy's definition of "accident," so that she should receive the double indemnity benefits. Hartford rejected King's claim, asserting that Schanus's voluntary intoxication, coupled with the danger inherent in drunk driving, rendered the crash a "self-inflicted injury" rather than an "accident" under the policy. We consider the question of whether Schanus's death was an accident or an intentional self-injury, and determine that the death was an accident.

We begin our analysis with the language of the policy. The policy provides for benefits for "accidental bodily injury." Hartford's policy does not define an

---

[1]The district court granted summary judgment to the insurer and denied the appellant's cross-motion for summary judgment. The latter is not appealable, but the appellant's motion should be reconsidered by the district court on remand.

"accident." Additionally, the policy expressly excludes coverage for "any intentionally self-inflicted injury, suicide or suicide attempt, whether sane or insane." In denying King's timely claim, Hartford relied on Black's Law Dictionary to define the term "accident" as "happening by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous." On that basis, Hartford asserted that Schanus's drunk driving and crash did not constitute an accident. Hartford explained that in its view, Schanus's intentional decision to drink and drive rendered the subsequent crash predictable, rather than unexpected or happening by chance. King then appealed from Hartford's denial of benefits to the district court, alleging a claim under ERISA, 29 U.S.C. § 1132(a).

At the district court, King demonstrated that only a small percentage of drunk driving instances result in death. The undisputed evidence showed that Schanus fully intended to survive his ride home. King argued that Schanus's subjective expectation was reasonable, given the statistical unlikelihood of death for a driver in his condition.

The district court determined that Hartford did not abuse its discretion in interpreting the policy to exclude Schanus's conduct, holding instead that Hartford reasonably identified death as a foreseeable outcome of driving a motorcycle while intoxicated.[2] The district court and the parties all relied primarily on the test laid out

[2]Alternatively, Hartford has argued that Schanus's intoxication itself established a self-inflicted injury that contributed to his death, thereby falling within the exclusion clause. Because a court or plan administrator must construe policy terms as a lay person would understand them, see 29 U.S.C. § 1022(a), we reject as unreasonable Hartford's contention that the term "injury" includes the intoxication itself, which happens to result in a fatal crash.

The analysis of whether the crash constituted an accident or not and the concept of a self-inflicted injury go hand-in-hand. If the injury from the crash is an accident, it is not self-inflicted. Moreover, the rejection of the claim by the district court did not rest on the exclusion as a self-inflicted injury, but on the theory that the

in <u>Wickman v. Northwestern Nat'l Ins. Co.</u>, 908 F.2d 1077 (1st Cir. 1990), although they disagreed over how the <u>Wickman</u> test should apply to Schanus's circumstances. Granting summary judgment to Hartford, the district court rejected King's argument that the closely analogous case of <u>West v. Aetna Life Ins. Co.</u>, 171 F. Supp. 2d 856 (N.D. Iowa 2001), should control. King timely appeals.

## II.    Discussion

We review the district court's grant of summary judgment de novo. <u>Farley v. Arkansas Blue Cross & Blue Shield</u>, 147 F.3d 774, 776 (8th Cir. 1998). We review the decision of Hartford, the ERISA plan administrator, for an abuse of discretion because the plan explicitly gives the administrator authority to construe policy terms. <u>See</u> <u>id.</u> at 777. "To determine if the trustees' interpretation of the Plan was reasonable, we consider (1) whether that interpretation is consistent with the goals of the Plan, (2) whether it renders any language of the Plan meaningless or inconsistent, (3) whether it conflicts with the requirements of ERISA, (4) whether the trustees have interpreted words at issue consistently, and (5) whether their interpretation is contrary to the clear language of the Plan." <u>Cavegn v. Twin City Pipe Trades Pension Plan</u>, 333 F.3d 879, 883 (8th Cir. 2003) (<u>citing</u> <u>Finley v. Special Agents Mut. Benefit Assoc.</u>, 957 F.2d 617, 621 (8th Cir. 1992)). In this case, the dispute centers only on the third <u>Finley</u> factor, whether Hartford's decision conflicts with the requirements of ERISA. We look to federal common law to identify the requirements of the statute. <u>See</u> <u>Shipley v. Arkansas Blue Cross & Blue Shield</u>, 333 F.3d 898, 902 (8th Cir. 2003).

---

resulting accident and death were foreseeable consequences of driving while intoxicated. Finally, we must note that the concept of a self-inflicted injury relates to an intentional attempt by the insured to injure himself, akin to suicide if death results. <u>See</u> <u>Wickman</u>, 908 F.2d at 1084.

This court has not previously addressed the question of whether a death resulting from drunk driving constitutes an "accident" under an ERISA policy that does not define the term. However, we now embrace the principle announced in Wickman as the most persuasive precedent on this issue. We also approve and follow the excellent application of Wickman principles conducted by the district court in West. In West, the court determined that an intoxicated driver's death was accidental and covered by an accidental death policy similar to the one in this case. 171 F. Supp. 2d at 905.

In setting out to establish our law in this area, we acknowledge that "[m]uch of the inconsistency in the case law defining and applying the definition of accident is traceable to the difficulty in giving substance to a concept which is largely intuitive." Wickman, 908 F.2d at 1087. Nevertheless, we remain guided by the oft-cited principle that the reasonable expectations of the insured party govern the construction of policy terms; no insurer can rely on confusing policy language to put an obstacle between an injured party and her lawful benefits. See, generally, Adam F. Scales, Man, God and the Serbonian Bog: The Evolution of Accidental Death Insurance, 86 Iowa L. Rev. 173, 175 (2000).

### A.  The Wickman Test

Wickman involved an insured person who fell to his death after he had purposely climbed over a guardrail on a high bridge, dangled by one hand from the ledge, and then fell to the railroad tracks below. 908 F.2d at 1080. The Wickman court reviewed the insurer's decision to deny coverage by applying a two-step test: first, the plan administrator must consider whether the insured person subjectively expected the harmful result; second, the administrator must determine whether that subjective expectation falls within what a reasonable person in the insured's particular position would objectively expect. See id. at 1088. The first step excludes from accident coverage anyone acting with the belief that his conduct would cause

the injurious outcome, such as insured persons committing or attempting suicide or other willfully dangerous behavior. See id. at 1084. Here, Hartford concedes that Schanus's decision to drive home drunk was just that, not a decision to commit suicide. Nor does Hartford present any evidence suggesting that Schanus subjectively undertook his last drive as a gamble or risky game, consciously ignoring the dangers inherent in drunk driving. King's claim therefore surpasses the first stage of Wickman analysis.

In applying the second step of Wickman, we heed the First Circuit's admonition that "[g]enerally, insureds purchase accident insurance for the very purpose of obtaining protection from their own miscalculations and misjudgments." Id. at 1088. Only when the insured person's subjective misjudgment conflicts with the objective expectations of a reasonable person in the insured's position will the conduct fall outside of the policy coverage. Id.

The Wickman court declared, and we agree, that a given act fails the objective test when a reasonable person would have viewed the following injury as a "highly likely" result of the act. Id. An injury is highly likely to occur when the odds favor that outcome. The circumstances in Wickman demonstrated a high probability of harm from the decedent's falling to his death. Thus, the court affirmed the insurer's denial of coverage.

## B.    Hartford's Definition of "Accident"

Hartford points out that its reliance on a dictionary to define the policy term of "accident" as "happening by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous" comports with the use of dictionaries in our precedents. See, e.g., Hutchins v. Champion Int'l Corp., 110 F.3d 1341, 1344 (8th Cir. 1997). Hartford suggests that by using a dictionary definition, it has satisfied its obligation to construe policy terms reasonably. When a plan

administrator uses a dictionary to define a policy term, that definition generally deserves affirmance under Finley, 957 F.2d at 621. However, accepting as reasonable Hartford's chosen definition of "accident," Hartford still had not finished construing the policy term. An accident "happen[s] by chance, or unexpectedly . . . ," but Hartford did not rely on those generic and somewhat circular terms. As our discussion below makes clear, Hartford has impliedly defined "unexpected" to cover even those events that the odds favor. In this case, Hartford's definition treats death as an expected outcome of drunk driving (and therefore survival as an unexpected outcome) even though survival remains more likely than death.

In the district court, King presented statistical evidence showing that drunk driving deaths constitute less than one percent of the number of people arrested for drunk driving.[3] See also West, 171 F. Supp. 2d at 903-04 (observing that a person "is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol-related automobile crash, and far more likely to arrive home than to be either arrested, injured, or killed"). We must determine whether Hartford reasonably concluded that the term "unexpected" does not extend to such statistically unlikely events as death from drunk driving. In other words, do one-in-a-hundred odds satisfy the "highly likely" standard to which Wickman referred?[4] We conclude that such

[3]Hartford neither disputes this evidence, nor objects to its consideration by this court. The record does not reflect whether King presented the same or similar evidence to Hartford in support of her initial claim, but even if she did not, Hartford has waived its objection. Furthermore, at the initial stage, the burden of establishing that otherwise covered conduct falls within an exclusion clause falls on Hartford. See Bell Lumber & Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

[4]The denial of coverage in Wickman presents an entirely different scenario than our case. In Wickman, "[the plaintiff] largely concede[d] that a reasonable person in Wickman's shoes would have expected to die or be seriously injured as a result of climbing over the guardrail and hanging on with only one hand." 908 F.2d at 1089. King has made no comparable concession.

long-shot chances fail the expectations part of the <u>Wickman</u> test, both subjectively and objectively.

## C. The Relation of Probability to the Meaning of "Highly Likely"

Hartford urges us to reject a statistical likelihood analysis in construing "highly likely to occur," pointing to <u>Wickman</u> itself for support. As Hartford emphasizes, the <u>Wickman</u> court expressly rejected as unreasonable the example of a Russian roulette player's subjective expectation of survival, even though a reasonable person in the player's position would understand she stood a better than 83% chance of beating the odds.[5] 908 F.2d at 1087. However, the difference between the roulette player and the drunk driver lies in each person's subjective acceptance of risk, not in the objective reasonableness of her conduct.

We think the better logic suggests that the Russian roulette player loses coverage at step one of the <u>Wickman</u> analysis, because the whole purpose of playing the "game" involves facing the risk of death consciously and directly. This scenario strikes us as similar to the facts of <u>Wickman</u>, where the insured person dangled himself over the side of a high bridge by one hand and consequently fell to his death. <u>Id.</u> at 1080. There, neither the plaintiff nor the First Circuit could imagine a legitimate purpose for Wickman's reckless conduct, <u>see</u> <u>id.</u> at 1089, such that in our view someone in his place must have subjectively understood the risk involved.[6] In

---

[5]Russian roulette involves placing a single bullet in a six-chambered revolver, spinning the chambers, aiming the gun at the player's own head, and pulling the trigger. Players apparently feel a thrill from facing and beating a one-in-six chance of committing suicide.

[6]Furthermore, although the <u>Wickman</u> court made no reference to any statistical evidence concerning the likelihood of death resulting from Wickman's one-handed dangle from the bridge, we have no trouble perceiving that risk as "highly likely" as a matter of raw probability.

contrast, no evidence suggests that Schanus subjectively understood his risk of dying; rather, his undisputed purpose in driving drunk was to reach his home safely.

### D. Reasonable Expectations Viewed from the Particular Perspective of the Insured

In distinguishing the Russian roulette player's expectations from the drunk driver's, our reasoning is supported by Estate of Wade v. Continental Ins. Co., 514 F.2d 304, 306-07 (8th Cir. 1975) (Lay, J.) (applying Iowa law but following a test basically identical to the Wickman two-part test). In Wade, we determined that a husband died by accident when he hit his wife, she responded by telling him that she would shoot him if she had a gun, and he then gave her a loaded gun and told her to shoot him (which she did). 514 F.2d at 306. We determined that the husband did not subjectively believe his wife would shoot him, and that a reasonable person in the husband's position would not have foreseen his wife's willingness to commit manslaughter. Id. at 307. The result depended on a close analysis of factors particular to the husband, including the fact that his wife had never threatened violence against him at any of the previous times he hit her.[7] Id.

While we recognize that Wade does not control the result in this case, we consider it persuasive in emphasizing that the objective component of the Wickman test must be viewed from the particular perspective of a reasonable person in the insured's position. Under the Wickman test on which we rely, an insured must have both a subjective intent and an objective expectation of not being injured. Wickman, 908 F.2d at 1088. Here, subjectively, the driver intended to come home safely. Further applying the objective test, a reasonable person in the shoes of the insured would not have viewed the crash and subsequent death as "highly likely to occur."

_____

[7]The facts in this case are far more compelling in support of accidental death than in Wade.

Wickman, 908 F.2d at 1088 ("[O]ne must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."). The insurer's contrary conclusion is arbitrary and an abuse of discretion.

## III.    Conclusion

Because Schanus's fatal crash constituted an "accident" under Hartford's accidental death policy, Hartford abused its discretion by denying double indemnity benefits to King. We reverse the district court's summary judgment in favor of Hartford and remand for such further proceedings as may be appropriate.

_____